IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 22-cv-01062-CMA-KLM

AVALON NICEWONDER, an individual,

    Plaintiff,

v.

FERGUSON ENTERPRISES, LLC, a Virginia limited liability company,

    Defendant.

_____

### RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

This matter is before the Court on Defendant's **Partial Motion to Dismiss Plaintiff's First Amended Complaint and Request for Jury Trial** [#19] (the "Motion"). Plaintiff filed a Response [#24] in opposition to the Motion [#21], and Defendant filed a Reply [#28]. Pursuant to 28 U.S.C. § 636(b)(1)(A) and D.C.COLO.LCivR 72.1(c), the Motion [#19] has been referred to the undersigned for a recommendation regarding disposition. *See* [#29]. The Court has reviewed the briefs, the entire case file, and the applicable law, and is sufficiently advised in the premises. For the reasons set forth below, the Court **RECOMMENDS** that the Motion [#19] be **GRANTED**.

### I.  Background[1]

---

[1] All well-pled facts from the Amended Complaint [#9] are accepted as true and viewed in the light most favorable to Plaintiff as the nonmovant. *See Barnes v. Harris*, 783 F.3d 1185, 1191-92 (10th Cir. 2015).

Plaintiff began her tenure with Defendant in February 2019 by participating in its inside sales trainee program, called the College of Ferguson in Richmond, Virginia, where she engaged in four months of training in a class of thirteen people. *Am. Compl.* [#9] ¶¶ 20-22. Her trainer and the other trainees voted her as the highest performing employee in her training class. *Id.* ¶ 23. After the training ended in June 2019, Plaintiff moved to her permanent location with Defendant in Colorado. *Id.* ¶ 24. Before she returned to Colorado, she went on a site visit for Defendant, where she toured the facility and met Peter Seyfried ("Seyfried"), her manager. *Id.* ¶¶ 25-26. At this first meeting, Plaintiff shared with Mr. Seyfried that she suffered from ADHD, depression, and anxiety, as well as information showing she was part of the LGBTQ+ community. *Id.* ¶ 27.

In Colorado, Plaintiff worked as an Inside Sales Representative for Defendant. *Id.* ¶ 28. Four other Inside Sales Representatives for Defendant worked on a team with her. *Id.* ¶ 29. She was the only female on her team and one of only three women working in Denver for Defendant. *Id.* ¶ 30. Defendant compensated Plaintiff for her work by paying her an hourly salary of $19.74 for forty-five hours of work per week. *Id.* ¶ 31.

Inside Sales Representatives generate revenue by promoting and selling the organization's products and services by telephone to existing or potential customers. *Id.* ¶ 32. They develop and maintain relationships with an assigned customer base, including key accounts ensuring satisfaction with products and services, and they answer customers' questions about products, prices, availability, product uses and credit terms. *Id.* ¶ 33. They also must maintain positive relationships with Defendant's other employees such as the warehouse associates, who ensure that orders are properly and

timely filled.  *Id.* ¶ 34.

Defendant has several people working as Warehouse Associates, none of whom were assigned to a particular Inside Sales Representative but who instead worked on orders as they were submitted.  *Id.* ¶¶ 35-36.  Ruben Quezada-Medrano ("Quezada-Medrano"), a male over 40 years old, worked at Defendant's Colorado location as a Warehouse Associate.  *Id.* ¶ 37.  Plaintiff met him during her first few weeks of working in Colorado.  *Id.* ¶ 38.  Mr. Quezada-Medrano plays basketball, and he told Plaintiff that the Warehouse Associates play basketball on Thursday nights, asking her if she would like to attend a basketball game.  *Id.* ¶¶ 39-40.  Because Plaintiff wanted to develop better relationships with the Warehouse Associates because they affected her production, she informed Mr. Quezada-Medrano she would like to play basketball, and so they exchanged phone numbers.  *Id.* ¶ 41.  Plaintiff did not give Mr. Quezada-Medrano her number other than to be friends and possibly play basketball.  *Id.* ¶ 42.

Mr. Quezada-Medrano texted Plaintiff after they exchanged phone numbers.  *Id.* ¶ 43.  Plaintiff responded to the text message for the first time on July 10, 2019.  *Id.* ¶ 44.  Initially, their conversation was about the activities they like to participate in and where they live, but later Mr. Quezada-Medrano changed the tone of the conversation.  *Id.* ¶¶ 45-46.  He injected information about his personal and private romantic life into the conversation, and he intimated that he and Plaintiff could enter a romantic relationship.  *Id.* ¶¶ 47-48.  In response to his advances, Plaintiff informed him that she was younger than him, that she had just left a bad relationship, and that she was a member of the LBGTQ+ community.  *Id.* ¶ 49.

After Plaintiff's response, Mr. Quezada-Medrano sent her six text messages to which she did not reply. *Id.* ¶ 50. The text messages became increasingly sexual and romantic, including when he called her a "youngen" [sic], said he was ready for the right woman, and commented about how her breasts were at his face level. *Id.* ¶¶ 51-52. After not receiving any responses from Plaintiff, Mr. Quezada-Medrano sent her a text apologizing for his forwardness and saying he wanted to "be [her] freak on a leash sexy." *Id.* ¶ 53. His text message also contained a picture of himself nude. *Id.* ¶ 54. The picture and the text messages were disturbing to Plaintiff, as they were unwanted and unsolicited. *Id.* ¶ 55.

Plaintiff immediately reported the incident to Mr. Seyfried, her manager, on July 11, 2019, who in turn reported the incident to District Manager Chris Cline ("Cline") and Director of Industrial Sales Marc Brown ("Brown"). *Id.* ¶¶ 56-57. Mr. Seyfried and Mr. Cline had a meeting with Plaintiff, where they both allegedly blamed her for Mr. Quezada-Medrano's sexual advances. *Id.* ¶¶ 58-59. They asked her if she had set any boundaries with him or told him that his conduct was unwanted. *Id.* ¶ 60. Mr. Cline then asked Plaintiff if she could go see him at that moment and tell him that his conduct must stop, which Plaintiff declined. *Id.* ¶ 61. Mr. Seyfried noticed that she was caught off guard and offended and/or confused by Mr. Cline asking her to confront Mr. Quezada-Medrano alone on the day after the harassment occurred, that she did not know what to do, and that she showed signs of distress. *Id.* ¶ 62. Mr. Seyfried stood up and said, "Chris, let's go talk to Ruben," i.e., Mr. Quezada-Medrano. *Id.* ¶ 63. Plaintiff emphasizes that the act of confronting Mr. Quezada-Medrano was initiated by Mr.

Seyfried, not Mr. Cline, that Mr. Cline did not ask her if she wanted him to stand up for her and confront Mr. Quezada-Medrano, and that Mr. Seyfried took control after seeing her reaction to Mr. Cline's suggestion. *Id.* ¶¶ 63-65. Mr. Seyfried asked Plaintiff to stay in the office until both Mr. Seyfried and Mr. Cline had confronted Mr. Quezada-Medrano. *Id.* ¶ 66.

Mr. Cline and Mr. Seyfried met with Mr. Quezada-Medrano, and they told him to stop contacting Plaintiff, but they took no other actions to protect her from him. *Id.* ¶¶ 67-68. Plaintiff had to see Mr. Quezada-Medrano every day and work with him regularly. *Id.* ¶ 69. Defendant did not schedule the two of them to work different shifts or take any action to prevent Mr. Quezada-Medrano from working on orders for Plaintiff. *Id.* ¶ 70.

After Plaintiff reported the sexual harassment to Defendant, Defendant began treating her differently and more adversely, in a manner designed to have a negative impact on her work performance. *Id.* ¶ 71. Defendant provided her with less work than her coworkers and did not supply her with work even though she asked for work on multiple occasions. *Id.* ¶¶ 72-73. Defendant's reluctance to provide her with work led to decreased performance on her part. *Id.* ¶ 74. Instead of allowing her to work on her sales, Defendant required her to visit the clients of other sales representatives and to perform tasks such as organizing the office, laminating forms, reviewing Material Test Reports, and developing a customer survey (without access to a budget from Defendant), which took a substantial amount of time. *Id.* ¶¶ 75-76. The tasks assigned to her prevented her from performing the core functions of her position, resulting in decreased performance. *Id.* ¶ 77.

Defendant had no issues with Plaintiff's performance until after her complaint about the sexual harassment. *Id.* ¶ 78. After the complaint, Defendant began having issues with Plaintiff's punctuality. *Id.* ¶ 79. The workday for Defendant begins at 7:00 am., and Defendant claims that Plaintiff regularly failed to show up on time for the start of her shift. *Id.* ¶¶ 80-81. However, Defendant would not allow Plaintiff to arrive at work before 6:55 a.m., even though Defendant allowed other employees who were not in Plaintiff's protected classes to arrive at work earlier. *Id.* ¶¶ 82-83. After arriving at work, Plaintiff had to start up and boot her computer, a process which took at least 8 minutes before she could begin work. *Id.* ¶¶ 84-85. In short, Plaintiff alleges that she was tardy because Defendant created special rules for her that made it impossible for her to arrive on time, and that Defendant did not discipline other employees out of her protected classes for arriving to work late. *Id.* ¶¶ 86-87.

At the end of November/start of December, Mr. Seyfried prepared a Performance Improvement Plan ("PIP") for Plaintiff. *Id.* ¶ 88. On December 3, 2019, Plaintiff had to take an unexpected leave of absence due to personal life issues, which were related to her treatment in her current work environment and feelings of danger from having to continue working in such close proximity with Mr. Quezada-Medrano. *Id.* ¶ 89. Plaintiff's mental health, relating to her trauma at work, caused her to take this leave of absence. *Id.* Plaintiff went on short-term disability leave from December 3, 2019, through January 15, 2020. *Id.* ¶ 90. Throughout her time on leave, Plaintiff kept in contact with Mr. Seyfried. *Id.* ¶ 91.

After Plaintiff returned to work, Defendant restricted her access to the workplace

and controlled her daily activities. *Id.* ¶ 92. Defendant had removed all of Plaintiff's major accounts, between nine and twelve of them, and required her to perform menial tasks such as laminating cards. *Id.* ¶ 93. Defendant did not inform Plaintiff that it had removed her biggest accounts from her. *Id.* ¶ 94. Rather, Plaintiff learned that Defendant had removed her biggest accounts from her only when she overheard a newly hired coworker speaking to a former customer/client. *Id.* ¶ 95.

On January 16, 2020, Mr. Seyfried presented the PIP to Plaintiff. *Id.* ¶ 96. The PIP concerned Plaintiff's sales productivity, her attendance, and her attitude. *Id.* ¶ 97. Defendant also replaced Mr. Seyfried as her direct supervisor with Zachary Releford ("Releford"), the Sales Team Manager, allegedly to help Plaintiff improve her performance, although Mr. Releford was already her supervisor and was already working closely with her. *Id.* ¶ 98.

At the time Defendant placed Plaintiff on the PIP it told her it would review the PIP with her every thirty days. *Id.* ¶ 99. On February 28, 2020, Plaintiff and Mr. Releford met regarding her performance on the PIP. *Id.* ¶ 100. He informed her that he needed more time to evaluate her but did find instances in which he had seen an improvement in Plaintiff's performance. *Id.* ¶ 101. Mr. Releford rarely met with Plaintiff or followed up with her regarding the PIP. *Id.* ¶ 101.

In March 2020, after the start of the COVID-19 pandemic, Defendant transitioned Plaintiff into a remote position. *Id.* ¶ 102. On April 16, 2020, Defendant laid off Plaintiff as part of an alleged company-wide reduction in force ("RIF"). *Id.* ¶ 103. Plaintiff was the only employee in her position selected by Defendant for the RIF. *Id.* ¶ 104.

Defendant selected her even though she was not the lowest tenured employee in her position.  *Id.* ¶ 105.

As a result of these allegations, Plaintiff brings eight claims against Defendant: (1) sex discrimination in violation of Title VII, *Am. Compl.* [#9] ¶¶ 111-25, (2) sex harassment/hostile work environment in violation of Title VII, *id.* ¶¶ 126-38, (3) sexual orientation discrimination in violation of Title VII, *id.* ¶¶ 139-46, (4) sex stereotyping in violation of Title VII, *id.* ¶¶ 147-57, (5) retaliation in violation of Title VII, *id.* ¶¶ 158-79, (6) disability discrimination in violation of the Americans with Disability Act ("ADA"), *id.* ¶¶ 180-89, (7) disability discrimination (regarded as disabled) in violation of the ADA, *id.* ¶¶ 190-98, and (8) disability discrimination (record of disability) in violation of the ADA, *id.* ¶¶ 199-204.  In the present Motion [#19], Defendants contend that Plaintiff's first and fifth claims should be dismissed in part and all other claims dismissed in full pursuant to Fed. R. Civ. P. 12(b)(6).

## II.  Standard of Review

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test "the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994); Fed R. Civ. P. 12(b)(6) (stating that a complaint may be dismissed for "failure to state a claim upon which relief can be granted.").  "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."  *Sutton v. Utah State Sch. for the Deaf & Blind,* 17 F.3d 1226, 1236

(10th Cir. 1999) (citation omitted).  To withstand a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain enough allegations of fact 'to state a claim to relief that is plausible on its face.'"  *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007) ("The complaint must plead sufficient facts, taken as true, to provide 'plausible grounds' that discovery will reveal evidence to support the plaintiff's allegations." (quoting *Twombly*, 550 U.S. at 570)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.  Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement."  *Id.* (brackets in original; internal quotation marks omitted).

To survive a motion to dismiss pursuant to Rule 12(b)(6), the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.4d 1188, 1191 (10th Cir. 2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," a factual allegation has been stated, "but it has not shown[n][ ] that the pleader is entitled to relief," as required by Fed. R. Civ. P. 8(a).  *Iqbal*, 552 U.S. at 679 (second brackets added; citation and internal quotation marks omitted).

### III.  Analysis

**A.    Claims One and Five: Title VII – Sex Discrimination and Retaliation**

Defendant argues that Claim One regarding sex discrimination and Claim Five regarding retaliation are untimely to the extent they are based on her assignment to "significantly less demanding and less responsible roles and duties" and her placement on a PIP.[2]  *Am. Compl.* [#9] ¶¶ 122, 168.

Title VII requires a plaintiff to file a charge of discrimination within 300 days of the discriminatory act that is the subject of the claim.  42 U.S.C. § 2000e-5(e)(1); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002).  Claims based on discrete acts outside the 300-day period prior to the date of the filing of the charge of discrimination are time-barred.  *Morgan*, 536 U.S. at 110.

Here, Plaintiff's Charge of Discrimination is dated February 9, 2021.[3]  *Def.'s Ex. A* [#19-1].  Thus, claims based on acts occurring on or after April 15, 2020, are timely. *See Morgan*, 536 U.S. at 110.  As outlined in the Background section above, all incidents regarding PIP and work assignments occurred prior to that date.  She alleges that, after she complained about Mr. Quezada-Medrano's unwanted contact in July 2019, Defendant gave her unfavorable work assignments causing her job performance to suffer. *Am. Compl.* [#9] ¶¶ 71-86.  From December 3, 2019, through January 15, 2020, Plaintiff

---

[2]  Defendant does not seek dismissal of Claim One and Claim Five to the extent they are based on the termination of Plaintiff's employment during the RIF.  *Motion* [#19] at 9.

[3]  The Court may consider the Charge of Discrimination [#19-1] without converting the Motion [#19] into a motion for summary judgment.  *See, e.g.*, *Werahera v. Regents of Univ. of Colo.*, No. 21-cv-02776-NYW, 2022 WL 3645979, at *6 n.5 (D. Colo. Aug. 24, 2022) (considering a Charge of Discrimination on a motion to dismiss without converting the motion to a motion for summary judgment because the plaintiff referenced the Charge in the complaint and did not object to the document's authenticity) (citing *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002)).

took a leave of absence, during which time Defendant removed her biggest accounts to give to other employees. *Id.* ¶¶ 90, 93. On January 16, 2020, she returned from leave and was placed on a PIP. *Id.* ¶¶ 89, 96. On April 16, 2020, she was laid off. *Id.* ¶ 103. Thus, all of the allegations relating to unfavorable work assignments and the PIP occurred prior to April 15, 2020.

Plaintiff essentially concedes that the unfavorable work assignments and the PIP cannot form the basis for these claims, although she stresses that they can be considered as background:

> The adverse action common to all [Plaintiff's] claims is her termination. An adverse employment action is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. However, a mere inconvenience or an alteration of job responsibilities does not qualify as an adverse action. Defendant's assigning [Plaintiff] less desirable job duties is not an adverse action under Title VII. Moreover, courts typically do not find that placing an employee on a performance improvement plan is a sufficient adverse action under Title VII. For these reasons, [Plaintiff] did not have an actionable claim until Defendant terminated her. Moreover, the court can properly consider discrete incidents outside the 300-day filing period as background evidence. As shown above, none of [Plaintiff's] claims solely rely on the PIP or the unfavorable work assignments. The Court can properly consider the facts outside the 300 days as background evidence.

*Response* [#24] at 14-17 (internal citations and quotation marks omitted). While the Court makes no finding at this time regarding the relevance of the unfavorable work assignments and the PIP as "background evidence," the Court finds that they are untimely as the bases for these claims.

Accordingly, the Court **recommends** that Plaintiff's Claim One regarding sex discrimination and Claim Five regarding retaliation under Title VII be **dismissed with**

**prejudice in part** to the extent premised on unfavorable work assignments and the PIP.[4] *See Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006) ("A dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) and granting leave to amend would be futile.").

**B.     Claim Two: Title VII - Sex Harassment/Hostile Work Environment**

In part, Defendant argues that Plaintiff's second claim, regarding sexual harassment/hostile work environment, fails to state a claim because it is untimely. *Motion* [#19] at 4; *Reply* [#28] at 2-4. In response, Plaintiff argues that Defendant's "termination of [Plaintiff's] employment on April 16, 2020, is sufficiently related to the hostile work environment to make her hostile work environment claim timely." *Response* [#24] at 10 (further stating that Plaintiff's "termination and the facts in her hostile work environment claim concern the same types of acts"). Plaintiff does not point to any other timely act to anchor this claim. *See id.* at 10-11.

Plaintiff's argument that the Court should deem this claim timely based on the date of her termination is not supported by legal authority. In *Bobelu-Boone v. Wilkie*, 526 F. Supp. 3d 971, 981-82 (2021), a court in the District of New Mexico considered a similar argument under a similar set of circumstances. There, the plaintiff had argued: "Plaintiff's allegedly poor OIG inspection, forced to work overtime and only receiving comp time, being given conflicting directives, and being asked to look for another job certainly relates to the final act of her hostile work environment claim, her termination." *Bobelu-*

---

[4] As explained below, the Court recommends dismissal of Plaintiff's remaining claims in full on other grounds. However, the Court notes that, to the extent any other claim is also premised on unfavorable work assignments or the PIP, it is untimely for the reasons explained above.

*Boone*, 526 F. Supp. 3d at 981-82 (emphasis omitted). The court there held that Plaintiff could not "use her termination to form part of her hostile work environment claim" for two reasons. *Id.* at 982. As is pertinent here, the court stated: "[W]hile the Tenth Circuit has not addressed the question, the majority of circuits have held that discrete acts like termination cannot form part of a hostile work environment claim." *Id.* (citing *Moses v. Dassault Falcon Jet-Wilmington Corp.*, 894 F.3d 911, 920 (8th Cir. 2018) (stating that "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify" and differ from a hostile environment claim which by its "very nature involves repeated conduct") (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) (citation omitted)))); *see also Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 223 (4th Cir. 2016); *Baird v. Gotbaum*, 662 F.3d 1246, 1252 (D.C. Cir. 2011). Plaintiff cites no legal authority to the contrary, and the Court is aware of none. Because the discrete act of termination on its own cannot make a sexual harassment/hostile work environment claim timely based on events occurring prior to the termination, Plaintiff's claim fails.

Accordingly, the Court **recommends** that Plaintiff's Claim Two regarding sexual harassment/hostile work environment be **dismissed with prejudice**. *See Brereton*, 434 F.3d at 1219 ("A dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) and granting leave to amend would be futile.").

## C. Claim Three: Title VII - Sexual Orientation Discrimination

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment,

because of such individual's race, color, religion, sex, or national origin; or . . . limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). In *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731 (2020), the United States Supreme Court held that sexual orientation is a type of sex discrimination which is therefore also protected by Title VII.

In general, an employment discrimination plaintiff must provide direct evidence of discrimination or else prove the elements of a prima facie case for employment discrimination as listed in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802 (1973). *See Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012). However, "[w]hile the 12(b)(6) standard does not require that Plaintiff establish a prima facie case in her complaint, the elements of each alleged cause of action help to determine whether Plaintiff has set forth a plausible claim." *Id.*

Title VII's prima facie case for discrimination requires the plaintiff to show that "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination." *McGowan v. Bd. of Trustees for Metro. State Univ. of Denver*, 114 F. Supp. 3d 1129, 1137 (D. Colo. 2015), *aff'd*, 645 F. App'x 667 (10th Cir. 2016). Defendant does not contest that Plaintiff has adequately alleged the first two elements but argues here that Plaintiff has failed to plausibly allege discriminatory motive which gives rise to a reasonable inference of discrimination on the basis of her sexual orientation. *Motion*

[#19] at 10-12; *Reply* [#28] at 7; *see also Tracy v. Vail Resorts, Inc.*, No. 21-4145, 2022 WL 16557393, at * (10th Cir. Nov. 1, 2022) ("Thus, to survive the motion to dismiss, [the plaintiff's] complaint only needed to allege facts linking [the defendant's] employment decisions to a discriminatory . . . motive, and giv[ing] rise to a reasonable inference of discrimination . . . . (internal citations and quotation marks omitted)).

Here, Plaintiff provides no argument that she was discriminated against on the basis of her sexual orientation. *See Response* [#24] at 14. Rather, the entirety of her argument focuses on her sex as a female. She states:

> In her Complaint, [Plaintiff] alleges she was the only female working on her team. Defendant provided her with less work than her coworkers, who are not a part of her protected classes. Further, Defendant allowed other employees not of her protected class to arrive at work early and arrive late. Finally, [Plaintiff] alleges she was the only employee in her position selected by [Defendant] for the reduction in force even though she was neither the lowest performing employee in her position nor the newest employee in her role. The inference derived from these facts is that Defendant treated her poorly and did not treat employees not of [Plaintiff's] protected class the same as it did [Plaintiff].

*Id.* Plaintiff fails to point the Court to any allegations which support an inference that she was discriminated against on the basis of her *sexual orientation*. Rather, Plaintiff's argument here focuses solely on Plaintiff's status as a female, which is the basis for her Claim One regarding sex discrimination under Title VII.

Accordingly, the Court **recommends** that Plaintiff's Claim Three regarding sexual orientation discrimination under Title VII be **dismissed without prejudice**. *See Brereton*, 434 F.3d at 1219 (stating that a Rule 12(b)(6) dismissal should generally be without prejudice where granting leave to amend may not be futile).

**D.     Claim Four: Title VII - Sex Stereotyping**

–15–

A Title VII claim for unlawful sex stereotyping, also known as gender stereotyping, requires a plaintiff to show that the employer's discrimination "against her [was] based on her failure to confirm to stereotypical gender norms." *Potter v. Synerlink Corp.*, 562 F. App'x 665, 674 (10th Cir. 2014).

Here, Plaintiff relies on the same argument discussed above in her Claim Three regarding sexual orientation discrimination under Title VII to show that Defendant's alleged unlawful actions occurred under circumstances giving rise to an inference of discrimination. Again, for the same reasons stated by the Court in connection with Claim Three, the Court finds that Plaintiff has failed to point the Court to any allegations in support of this inference. In other words, Plaintiff has not sufficiently alleged that any discrimination occurred on any basis other than sex, the basis for her Claim One. She has not described any stereotypical gender norms to which she alleges she failed to conform and which therefore provided Defendant with motivation to take action against her in violation of Title VII. Merely arguing that she is a female, without discussing why the claim survives based on stereotypical gender norms, is insufficient.

Accordingly, the Court **recommends** that Plaintiff's Claim Four regarding sex stereotyping be **dismissed without prejudice**. *See Brereton*, 434 F.3d at 1219 (stating that a Rule 12(b)(6) dismissal should generally be without prejudice where granting leave to amend may not be futile).

### E.     Claims Six, Seven, and Eight: ADA - Disability Discrimination

The parties combine their arguments with respect to Plaintiff's three ADA claims: Claim Six regarding disability discrimination (disability), Claim Seven regarding disability

discrimination (regarded as disabled), and Claim Eight regarding disability discrimination (record of disability).   See 42 U.S.C. § 12102(1) (defining "disability" under the ADA as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment.").

For ADA disparate-treatment claims (which all of these appear to be, as opposed to ADA failure-to-accommodate claims), a prima facie case includes the following elements: (1) the plaintiff is disabled (or regarded as disabled or has a record of disability), (2) the plaintiff can perform, either with or without reasonable accommodation, the essential functions of the job, and (3) the defendant terminated (or took other adverse action) against her because of her disability, perceived disability, or record of disability. *See, e.g.*, *Exby-Stolley v. Bd. of Cnty. Comm'rs*, 979 F.3d 784, 794 (10th Cir. 2020). Here, Defendant does not contest that Plaintiff has adequately alleged the first two elements, but only that she has not adequately alleged the third.   *Motion* [#19] at 12-14; *Reply* [#28] at 10; see *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 544 (10th Cir. 2014) (describing the third element as requiring a showing that the adverse employment action occurred "under circumstances which give rise to an inference that the termination was based on [her] disability").

With respect to that third element, Defendant argues:

> "[Plaintiff] lack[s] the necessary factual support for an inference of discrimination based on a disability or perceived disability.  There are no allegations of similarly situated employees and whether they have any disabilities.  There is nothing to connect the decisionmakers on Plaintiff's PIP and termination with an anti-disability motive.  With respect to her "regarded-as" claim, in particular, Plaintiff does not even identify the

–17–

>disability she was regarded as having, or who regarded her as such. Thus, Plaintiff's allegations are insufficient to show that disability discrimination was "the plausible, rather than just the possible reason" for Defendant's actions against her.

*Motion* [#19] at 15 (internal citations omitted). In response, Plaintiff merely states:

>All [Plaintiff] must do to meet her burden at the motion to dismiss stage is to show she was treated poorly and that others not of her protected class were treated better than her. [Plaintiff], in each of her ADA claims, establishes that Defendant treated her poorly. [Plaintiff] then pleads that the conduct deprived her of rights and working conditions given to employees, not her protected class. Through these facts, [Plaintiff] raised an inference of discrimination.

*Response* [#24] at 15 (internal citation omitted).

Plaintiff relies on *DeLesline v. Vilsack*, No. 20-cv-03809-RMR-NRN, 2021 WL 4201631, at *4 (D. Colo. Aug. 30, 2021), *adopted in relevant part by DeLesline v. Vilsack*, No. 20-cv-03809-RMR-NRN, 2022 WL 4009991 (D. Colo. Mar. 23, 2022), to show that she has adequately alleged her ADA claims. There, however, the plaintiff had provided much more detailed allegations with respect to his ADA claim, including:

>[A]mong other things, that there were non-disabled, Caucasian employees who, like Plaintiff, requested extensive leave for temporary medical conditions, but, unlike Plaintiff, they were not required by the supervisor to provide burdensome medical information and then threatened with AWOL or the removal of their supervisory authority if they failed to provide such information. Plaintiff also claims that his supervisor would exclude him from meetings and instructed him to issue orders and then would personally countermand them. However, according to Plaintiff, the supervisor did not undermine non-disabled, Caucasian employees in this manner, nor did the supervisor kick them out of their offices for no reason, as he did to Plaintiff.

*DeLesline*, 2021 WL 4201631, at *4. Here, beyond the general allegations of a disability and poor treatment, she has failed to direct the Court's attention to any allegations showing that Defendant's adverse action(s) occurred under circumstances giving rise to

an inference of discrimination on the basis of that disability.  See, e.g., *Jackson-Cobb v. Sprint United Mgmt.*, 173 F. Supp. 3d 1139, 1145 (D. Colo. 2016) (holding that allegations made upon information and belief that employees outside of the plaintiff's protected class were treated differently were conclusory and insufficient to support an inference of discrimination on a motion to dismiss).

Accordingly, the Court **recommends** that Plaintiff's Claims Six, Seven, and Eight under the ADA be **dismissed without prejudice**. *See Brereton*, 434 F.3d at 1219 (stating that a Rule 12(b)(6) dismissal should generally be without prejudice where granting leave to amend may not be futile).

## IV.  Conclusion

For the reasons stated above,

IT IS HEREBY **RECOMMENDED** that the Motion [#19] be **GRANTED**.[5]

IT IS FURTHER **ORDERED** that pursuant to Fed. R. Civ. P. 72, the parties shall have fourteen (14) days after service of this Recommendation to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned.  A party's failure to serve and file specific, written objections waives de novo review of the Recommendation by the District Judge, Fed. R. Civ. P.  72(b); *Thomas v. Arn*, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions.  *Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1210 (10th Cir. 1999); *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996).  A party's objections to this

---

[5]  If this Recommendation is adopted in full, Plaintiff's remaining claims will be Claim One regarding sex discrimination under Title VII with respect to her employment termination and Claim Five regarding retaliation under Title VII with respect to her employment termination.

Recommendation must be both timely and specific to preserve an issue for de novo review by the District Court or for appellate review. *United States v. One Parcel of Real Prop.*, 73 F.3d 1057, 1060 (10th Cir. 1996).

DATED: January 17, 2023

BY THE COURT:

Kristen L. Mix
United States Magistrate Judge